# EXHIBIT A

JOSEPH A. CARMEN, P.A.
43 KINGS HIGHWAY WEST
HADDONFIELD, NJ 08033
(856) 354-2323; FAX (856) 429-1098
Attorney for Plaintiffs

JAMES FOX, RICHARD DI FABIO,  :
RONALD FORBES, ROBERT STILES,
DANIEL GEARY, ANTHONY SCARDA-  :
PONE and THOMAS PARRY,
                               :
                    Plaintiffs,
                               :
    vs.
                               :
THE LANGSTON CORPORATION,
BANKBOSTON and FLEETBOSTON     :
FINANCIAL CORP., J/S/A,
                               :
                    Defendants.
                               :

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION-CAMDEN COUNTY

**L  2862  00**

DOCKET NO.

CIVIL ACTION

COMPLAINT AND DEMAND FOR
JURY TRIAL

Plaintiffs, James Fox residing at 816 Broddock Terrace, Mt. Laurel, N.J., Richard Di Fabio, residing at 96 Geneva Ave., Westmont, N.J., Ronald Forbes, residing at 1 Edge Hill Rd., Gibbsboro, N.J., Robert Stiles, residing at 4128 Langshore Ave., Philadelphia, P.A., Donald Geary, residing at 134 Mill St. , Mount Holly, N.J., Anthony Scardapone, residing at 7132 Golfview Drive, Pennsauken, N.J. and Thomas Parry, residing at 13 Magnolia Drive, Newtowne, P.A., by way of Complaint against the Defendants say:

FIRST COUNT

1.   Plaintiff, James Fox, was an employee of defendant The Langston Corporation from October, 1969 to February, 2000, and at the time of his termination was fully and qualified to continue his duties with said Defendant. Said Plaintiff was , born on August 17, 1937 and is a member of the protective class.

2.   Plaintiff, Richard Di Fabio, was an employee of defendant The Langston

Corporation from January, 1978 to February 2000, and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on October 11, 1938, and is a member of the protective class.

3.    Plaintiff, Ronald Forbes, was an employee of Defendant Langston Corporation form April, 1974 to February, 2000 and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on November, 17, 1941, and is a member of the protective class.

4.    Plaintiff, Robert Stiles, was employed by the Defendant, the Langston Corporation from April, 1994 to February, 2000, and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on April 11, 1938 and is a member of the protective class.

5.    Plaintiff, Daniel Geary, was employed by Defendant, The Langston Corporation from September, 1961, to February, 2000, and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on January 25, 1937 and is a member of the protective class.

6.    Plaintiff, Anthony Scardapone, was employed by Defendant, The Langston Corporation from January 1962, to February, 2000, and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on January 3, 1936, and is a member of he protective class.

7.    Plaintiff, Thomas Parry, was employed by Defendant, The Langston Corporation,

- 2 -

from February, 1988 to February, 2000, and at the time of his termination was fully capable and qualified to continue his duties with said Defendant. Said Plaintiff was born on March 17, 1953, and is a member of the protective class.

8.   Defendant, The Langston Corporation, is a corporation authorized to do business in the State of New Jersey with offices located at 111 Woodcrest Road, Cherry Hill, New Jersey.

9.   On or about February 4, 2000, defendant, The Langston Corporation terminated all Plaintiffs' pursuant to a reduction force which was allegedly caused by "economic problems".

10.  The alleged reason for the termination of the Plaintiffs was pretextual, when in fact Plaintiffs' termination was due to age and in violation of N.J.S.A.  10:5-1, et seq.

11.  As a result of the illegal action on the part of the Defendant, The Langston Corporation, Plaintiffs were damaged.
WHEREFORE, Plaintiffs demand judgment against Defendant, The Langston Corporation.

    1.   Awarding Plaintiffs damage in a sum equivalent to the losses sustained by them as a result of the Defendant, The Langston Corporation illegal actions.

    2.   Ordering Defendant, The Langston Corporation, to reinstate Plaintiffs to their prior employment.

    3.   Awarding reasonable counsel fees.

    4.   Awarding Plaintiffs costs, interest and any other relief the Court may deem proper.

- 3 -

SECOND COUNT

1.    Plaintiffs hereby repeat each and every paragraph of the First Count as if set forth at length herein.

2.    Defendant, BankBoston acquired ownership of Defendant, The Langston Company on or about June 30, 1998 and since that date to present, Defendant, The Langston Corporation has been the servant, agent and bailee of Defendant BankBoston.

3.    Defendant BankBoston though it's agents took part in the reduction in force with Defendant, The Langston Company which resulted in the violation of N.J.S.A. 10:5-1 et seq., and damaged the Plaintiffs herein.

WHEREFORE, Plaintiffs demand judgement against Defendant BankBoston.

   1.    Awarding Plaintiffs damages in a sum equivalent to the losses sustained by them as result of the Defendant, BankBoston's illegal actions.

   2.    Awarding reasonable counsel fees.

   3.    Awarding Plaintiffs costs, interest and any other relief the Court may deem just.

THIRD COUNT

1.    Plaintiffs hereby repeat each and every paragraph of the First and Second Counts as if set forth at length herein.

2.    Defendant, FleetBoston Financial Corporation is the parent Company of Defendant, BankBoston having been established as a result of a merger between defendant BankBoston and Fleet Financial Corporation.

3.    At times set for herein, Defendant, BankBoston was the agent, servant and bailee of Defendant, FleetBoston Financial Corporation at the time the illegal acts set

forth herein.

4.    As a result of the illegal actions of Defendant, FleetBoston Financial Corporation,
the Plaintiffs were damaged.

WHEREFORE, Plaintiff demand judgment against Defendant, FleetBoston
Financial Corporation:

1.    Awarding Plaintiffs damages in a sum equivalent to the losses sustained by
them as a result of Defendant, FleetBoston Financial Corporation's illegal
actions.

2.    Awarding reasonable counsel fees.

3.    Awarding Plaintiffs costs, interest and any other relief the Court may deem
just.

## FOURTH COUNT

1.    Plaintiff hereby repeats each and every paragraph of the First, Second and Third
Counts as if set forth at length herein.

2.    The action of all Defendants in violating the rights of the Plaintiff was malicious
and/or in wanton disregard of each Plaintiff's rights.

WHEREFORE, Plaintiffs demand judgment against for punitive damages.

JOSEPH A. CARMEN, P.A.
Attorneys for Plaintiffs

BY: _____
Joseph A. Carmen

DATED:

## JURY DEMAND

- 5 -

Plaintiffs hereby demand a trial by jury on all issues so triable.

JOSEPH A. CARMEN, P.A.
Attorney for Plaintiffs

DATED:                                    BY: _____
                                              Joseph A. Carmen

## CERTIFICATION (R. 4:5-1)

The Plaintiffs hereby certify that the matter in controversy is not the subject of any other action pending in any court and is likewise not the subject of any pending arbitration proceeding. The Plaintiffs further certify that they have no knowledge of any contemplated action or arbitration proceeding which is contemplated regarding the subject matter of this action and that they are not aware of any other parties who should be joined in this action.

JOSEPH A. CARMEN, P.A.
Attorney for Plaintiffs

DATED:                                    BY: _____
                                              Joseph A. Carmen

EXHIBIT B

1                   SUPERIOR COURT OF NEW JERSEY
                   LAW DIVISION-CAMDEN COUNTY

2                   L-2862-00

3      ------------------------------------

4  JAMES FOX, RICHARD DiFABIO,        ORIGINAL
    RONALD FORBES, ROBERT STILES,

5  DANIEL GEARY, ANTHONY SCARDAPANE
    AND THOMAS PARRY,

6                        DEPOSITION OF:
                        RONALD FORBES

7        Plaintiffs,

8  v.

9  THE LANGSTON CORPORATION,
    BANK BOSTON AND FLEET BOSTON

10  FINANCIAL CORP., j/s/a,

11        Defendants.

12  ------------------------------------

13  TRANSCRIPT of the stenographic notes of the

14  proceedings in the above-entitled matter, as taken

15  by and before MARGARET M. REIHL, CCR, RPR, CRR,

16  CLR and Notary Public, held at the offices of

17  JOSEPH A. CARMEN, ESQUIRE, 9004-H Lincoln

18  Drive West, Marlton, New Jersey, on Tuesday,

19  October 6, 2009, commencing at 10:01 a.m.

20

21

22

23

24

25    Job No.: 219102

120

1  says they're going to do it.

2  Q.      Well, do you --

3  A.      That was already promised to us.

4  Q.      You're pointing to Exhibit D-2?

5  A.      Yeah, that's more up-to-date than that.

6  Q.      And if you turn to Page 2, under Final Pay, it

7  says, in accordance with the company's severance plan;

8  do you see that?

9  A.      Right.

10 Q.      Pay plan?

11 A.      But I didn't know if this was still in effect

12 or not because it's an old, old document.

13 Q.      Okay.

14 A.      That may have been changed.  We don't have a

15 newer document.  That was made in 1974, I believe, and

16 that could be an old plan that doesn't take -- isn't

17 valid anymore.

18 Q.      And then I'm going to turn to Page 7 of the

19 plan document that you produced today?

20 A.      Right, right.

21 Q.      Okay.  It says, "the Plan may be amended,

22 modified or terminated at any time by the Plan Sponsor

23 without previous notice to any person or entity.  The

24 Plan shall be operated under federal law."  You see

25 that?

121

1  A.       Correct, correct.

2  Q.       Okay.  And then you see how it says "the

3  following 'Statement of ERISA rights' is provided

4  pursuant to Section 2520.102-2(t)."  Do you see that?

5  A.       I see that.

6  Q.       So did you understand that ERISA covers the

7  severance payment that's referred to in the plan?

8  A.       I'm very vague on that.  I don't understand

9  that too much.

10 Q.       But it says, "the Plan shall be operated under

11 federal law."  Do you see that?

12 A.       Yes.

13 Q.       And you are asserting a claim of unpaid

14 severance?

15 A.       Because of what's in the severance thing here.

16          MR. NOVICH:  Okay.  And I'm just going

17 to put on the record that prior to today we were not

18 provided with a copy of the plan document, and

19 Mr. Carmen is indicating he wasn't provided with it

20 either prior to today, and I'm just --

21          THE WITNESS:  They never asked for it.

22          MR. NOVICH:  I'm putting you on notice

23 that your claim, what you are providing us with

24 notice, first time we're learning today is a claim

25 under severance plan that's governed by federal law

122

1   and --

2                   MR. CARMEN:  Well, wait a minute.

3                   MR. NOVICH:  That's what the plan says.

4                   MR. CARMEN:  I'm going to object to

5   that only on the basis that, first of all, it has to

6   be marked if you're going to use it; and, secondly, it

7   should be as to when that document was made, to the

8   best of his knowledge.

9                   Also, the section cited I think under

10  ERISA may, in fact, have been changed.  I mean, that

11  was in 1974.  The Act has been amended many, many

12  times, but I'm just saying that for the record.

13                  MR. NOVICH:  We can mark this.  Do you

14  want to take the time to mark the original?

15                  MR. PANTALEO:  We should copy it and

16  then mark it.

17                  MR. NOVICH:  Okay.  We could that.

18  Joe, do you want to take the time now to mark this?

19                  MR. CARMEN:  That would be D-3?

20                  MR. NOVICH:  Yeah.

21                  MR. CARMEN:  Yeah, why don't we mark

22  it, and I can get copies while you're out.

23                  MR. NOVICH:  Well, are we going to mark

24  the original?

25                  MR. CARMEN:  You can mark the original,

123

1   and I will make copies -- well, no, let me make a copy

2   first.

3               MR. NOVICH:  So why don't we take a

4   two-minute break and --

5               MR. CARMEN:  Yeah.

6               (Brief recess taken at 1:07 p.m.)

7               (Document marked for identification

8         as Defendant's Deposition Exhibit Number 3.)

9               (Deposition resumes at 1:14 p.m.)

10  BY MR. NOVICH:

11  Q.       So you have in front of you Exhibit D-3?

12  A.       D-3, yes.

13  Q.       Your attorney, Mr. Carmen, just copied the

14  original document, which you were testifying about

15  before; is that correct?

16  A.       Correct.

17              MR. NOVICH:  Now, I just want to finish

18  the statement I was about to place on the record;

19  that, again, this is the first time we're being

20  notified, and Mr. Carmen indicated he as well, that

21  your claim for unpaid severance benefits is based in

22  part on this summary plan based on your testimony here

23  today.  And at least based on the plan document it

24  says it's operated under federal law, and it appears,

25  even though ERISA may be amended, at least from the

124

1  plan document that you said is the basis of your

2  claim, that it's governed by federal law.  So this is

3  the first time we're receiving notification of the

4  basis for your claim, and I'm just placing that on the

5  record, and, you know, we'll act accordingly in

6  response to this notification that we're receiving for

7  the first time today.

8  BY MR. NOVICH:

9  Q.      Now, do you recall receiving any other

10  severance pay plan documents like this?

11  A.      No.

12  Q.      And do you remember when you received Exhibit

13  D-3?

14  A.      I would think it's when I first started

15  working at Langston.  It doesn't have a date on here,

16  so I have no idea exactly.  I've had it in my folder

17  for many years, so I assume it was way back in the

18  beginning of my employment.

19  Q.      Did you ever have any communications or

20  conversations with anyone at Langston or anywhere else

21  regarding this document, Exhibit D-3?

22  A.      No.

23  Q.      And then other than the conversation you told

24  me about with Mr. Coyle, have you ever had any other

25  communications with anyone at Langston regarding the

# EXHIBIT C

THE LANGSTON
SEVERANCE PAY PLAN
SUMMARY PLAN DESCRIPTION


PART I
INTRODUCTION

The Langston Division of Molins Machine Company, Inc.
("Langston") sponsors a Severance Pay Plan to help ease the
financial impact upon eligible terminated employees of
termination of Employment with Langston under certain
circumstances.  The program, which is provided by Langston at its
sole expense, is called a "welfare benefit plan" under the law,
and its most important features are described below.  Preserve
this Summary Plan Description booklet, and refer to it when
questions arise.  If you have any unanswered questions or would
like assistance in understanding or interpreting either this
booklet or the program it describes, please ask the Plan
Committee's Representative (see lines E through G of Part II,
below).

Please remember that this Summary Plan Description is
only a summary.  As such, it is shorter and less technical than
the underlying legal documents which establish the Plan,
determine who is eligible for benefits and specify the size and
nature of benefit payments.  This Summary Plan Description does
not alter the Plan or any legal instrument related to the Plan's
creation, operation, funding or benefit payment obligations.  If
there is any conflict or inconsistency between this Summary Plan
Description and the documents constituting the Plan, the
documents constituting the Plan shall control.  You and your
beneficiaries may examine the Plan, the funding vehicle documents
(if any) such as trust agreements and insurance contracts, all
amendments and riders to each, and certain other documents and
records pertaining to the Plan during regular business hours or
by appointment at a mutually convenient time in the office of the
Plan Sponsor's Representative (see line A.6. of Part VII,
below).  You may obtain copies of the documents constituting the
Plan and of certain reports from the Plan Sponsor's
Representative (who may impose a reasonable charge for those
copies, as prescribed by federal regulation).


PART II
PARTICIPATION REQUIREMENTS

All full-time salaried employees of Langston are covered
by the Severance Pay Plan exclusive of those employees who are
paid on an hourly basis.  Previously full-time employees who have

-1-



Exhibit
D-3
10/6/09   M.Reihl

been involuntarily reduced to part-time employment are also eligible for participation under the Plan.

To become eligible for benefits as a Participant under this Plan, you must satisfy one of the requirements listed below:

You must have been involuntarily terminated from your position, resulting in an Employment Termination Date through:

     (a)   elimination of your position with Langston;

     (b)   notification by Langston that because of changes in your position you are no longer qualified for it;

     (c)   notification by Langston that your job performance is unsatisfactory for reasons other than willful misconduct or Just Cause; or

     (d)   termination of your employment as a result of a reorganization of job functions.

## Special Definitions

"Employment Termination Date" is the date on which your employment with Langston ceased through involuntary termination.  Involuntary termination does not include voluntary resignation, retirement, death, sickness or disability which is covered under any sick pay or disability program maintained by Langston.

"Just Cause" is any reason for terminating an employee's employment with Langston including breach of trust, excess lateness or absenteeism, insubordination, willful misconduct and any other reason judged to be unacceptable behavior.

"Grade" means the classification level assigned by Langston to a specific employment position.

"Compensation" means base salary or wages earned during the applicable time period.  It does not include overtime payments, bonuses, commissions, contributions made by Langston for Social Security or for any retirement or deferred compensation plan, or fringe benefits.

## PART III
### BENEFITS PROVIDED

The maximum benefits provided under the Plan are equal to the product of your Benefit Unit Value and your Benefit Units Awarded, less any deductions described below:

(1) Your Benefit Unit Value is the amount of your annual Compensation divided by fifty-two (52).

(2) Your Benefit Units Awarded are determined in accordance with the following chart:

### BENEFIT UNITS

#### Years of Service

| Grade | Less Than 1 Year | 1 Year But Less Than 3 Years | 3 Years But Less Than 5 Years | 5 Years But Less Than 7 Years | 7 Years But Less Than 10 Years | 10 Or More Years |
|---|---|---|---|---|---|---|
| Non Exempt | 2 | 3 | 5 | 7 | 9 | 1 x yrs svc |
| Exempt | 3 | 4 | 6 | 8 | 10 | 1.5 x yrs svc |
| Supervision | 4 | 6 | 8 | 10 | 12 | 2.0 x yrs svc |
| Sr. Management | 5 | 8 | 12 | 16 | 20 | 2.5 x yrs svc |

(3) The maximum number of Benefit Units that may be awarded is fifty-two (52). A Year of Service is the twelve-month period beginning on your most recent date of employment with Langston and on each anniversary thereof. All fractional Years of Service shall be disregarded.

(4) Your Maximum Benefit shall be reduced by an amount described below for each week after you received a written notice of your involuntary termination during which you continued in the employ of Langston and received your regular weekly compensation. The amount of your Maximum Benefit shall be reduced by an amount equal to the product of the number of weeks during which you had received written notice of your termination multiplied by your Benefit Unit Value described above.

-3-

PART IV
## FORM AND DURATION OF BENEFIT PAYMENTS

Benefits shall be paid in periodic installments, not more often than weekly.  When benefits are paid in weekly installments, the amount of each installment will be equal to one week of Compensation.  Similarly, when benefits are paid on monthly installments, the amount of each installment will be equal to one month's Compensation.  Interest shall not accrue on any outstanding balances to be paid.  The Committee reserves the right to accelerate payments or to direct that payment be made in a single sum distribution.

If you die prior to receipt of the entire benefits due you, you will forfeit the balance of the benefits provided to you under this Plan.

Benefit payments shall be mailed to your address as filed with Langston.  Benefits shall commence as soon as possible following your Employment Termination Date and shall be completed no later than one year from the Employee's Termination Date. Payments shall terminate when all benefits payable to you under this Plan have been completed or upon your death, if earlier. The Committee reserves the right to terminate payments at any time upon discovery that a Participant's termination of employment was predicated upon Just Cause.

The events indicated below shall result in disqualification, ineligibility or denial, loss, forfeiture or suspension of any benefits that you or your beneficiary might otherwise anticipate or receive:

Termination or modification of the Plan (a right reserved to the Plan Sponsor);

Change of your position so that you are no longer in the class of employees covered (see Part II);

Inability of the Plan Sponsor to pay benefits when due;

Determination by the Committee that claimant is not entitled to benefits claimed, or that he/she has already received the maximum benefit provided under the program (see note (2) at the end of this booklet);

Failure to apply for benefits on a timely basis;

Failure to provide evidence of eligibility for benefit payments satisfactory to the Committee.

Premature death.

## PART V
## SOURCES OF PLAN FUNDING

Contributions to provide benefits under the Plan shall be made by the Sponsor only. No contributions are required of Participants. The amount contributed by the Sponsor shall be determined by the amount of benefits claimed and payable. Benefits under the Plan are funded through the general funds of the Sponsor.

## PART VI
## CLAIMS PROCEDURE

You (or your beneficiary) should advise the Committee's Representative whenever you believe you are eligible for benefits under the Plan. You must complete any written application for benefits required by the Plan Sponsor and/or any insurance company providing benefits under the Plan. Failure to make immediate application for benefits or to provide such evidence as may be required to certify entitlement to the benefits claimed will delay, and may prevent, payment of the benefits sought.

In the event that your claim for benefits is denied in whole or in part, and you feel that such denial was unjustified, you can appeal the claim denial. You will be notified of any full or partial claim denial in writing. The notification will contain such information as is required by regulations issued by the Secretary of Labor, and such additional information as is deemed appropriate to help you perfect your claim and understand its original denial.

If your claim has been denied, you may file with the Committee's Representative a notice of appeal. All such notices must be in writing, must set forth all of the facts upon which the appeal is based, and must be filed within 60 days of the date of the notice of denial. Any appeal not timely filed shall be barred, except to the extent that delay was unavoidable. Upon receipt of a notice of appeal, the Committee's Representative shall establish a hearing date on which you may make an oral presentation in support of your appeal. All oral presentations shall be heard by a "Named Appeals Fiduciary" appointed by the Plan Sponsor. The Named Appeals Fiduciary shall also review all written materials and evidence that you may wish to submit in support of your appeal or in furtherance of your claim. You may elect to forego the oral presentation. If you choose not to make an oral presentation, the Named Appeals Fiduciary shall determine

the merits of the appeal on the basis of such written evidence as
has been presented by the parties.  The determination of the
Named Appeals Fiduciary shall be binding upon the parties, and
will be supported by a written statement by the Named Appeals
Fiduciary of the basis upon which his/her decision was reached.

## PART VII
### TECHNICAL DETAILS

A.  Information about the Plan Sponsor

    1.  The Plan Sponsor is:  The Langston Division of Molins
Machine Company, Inc.

    2.  The Plan Sponsor's address is:  111 Woodcrest Road, P.O.
Box 5700, Cherry Hill, NJ 08034-0517

    3.  The Plan Sponsor's telephone number is:  (609) 795-7100

    4.  The Employer Identifying Number assigned by the Internal
Revenue Service to the Plan Sponsor is:  54036840

    5.  The Plan is administered by a Committee appointed by
Molins Machine Company, Inc.  The Committee is
represented by:  Richard E. Slaugenhoupt

    6.  The Committee's Representative's Telephone Number is:
(609) 795-7100

B.  Identification of the Plan

    1.  The Name of the Plan is:  <u>Langston Salaried Employees
Severance Pay Plan</u>

    2.  The Plan Number (PN) assigned by the Sponsor is:  506

    3.  The Plan is a welfare benefit plan of the following
type:  Severance pay plan for involuntary termination
providing supplemental unemployment type benefits

    4.  The last day of the plan's fiscal year is:  December 31

C.  Plan Administration

    1.  Type of Plan Administration:  Committee Administration

    2.  Identity of the Plan Administrator:  The Committee.
The Committee acts through, and may be contacted
through, the Committee's Representative (who is

-6-

identified on line A.5 of Part VII). All inquiries, requests for information, for document examination, and for copies of documents should be directed to the Representative. All personal data about you which might have a bearing on your right to participate under the Plan, or on your benefits, should be directed to the Representative. The Representative is also the agent for the service of legal process, which may also be served on the Plan Sponsor.

## PART VIII
## MISCELLANEOUS

The Plan may be amended, modified or terminated at any time by the Plan Sponsor without previous notice to any person or entity. The Plan shall be operated under federal law.

The following "Statement of ERISA Rights" is provided pursuant to Section 2520.102-2(t), Title 29, Code of Federal Regulations. It does not describe the Plan which is the subject of this "Summary Plan Description." The "Statement" should not be construed as (a) legal advice or (b) material for which any party related to the plan is responsible. The "Statement" is the product of the U.S. Dept. of Labor.

As a participant in the plan [identified on line B.1 of Part VII] you are entitled to certain rights and protections under the Employee Retirement Income Security Act of 1974 (ERISA). ERISA provides that all plan participants shall be entitled to:

Examine without charge, at the plan administrator's office and at other specified locations, such as work sites and union halls, all plan documents, including insurance contracts, collective bargaining agreements and copies of all documents filed by the plan with the U.S. Department of Labor, such as detailed annual reports and plan descriptions.

Obtain copies of all plan documents and other plan information upon written request to the plan administrator. The administrator may make a reasonable charge for the copies.

Receive a summary of the plan's annual financial report. The plan administrator is required by law to furnish each participant with a copy of this summary annual report.

-7-

In addition to creating rights for Plan Participants, ERISA imposes duties upon the people who are responsible for the operation of an employee benefit plan. The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan Participants and beneficiaries. No one, including your employer, your union, or any other person, may fire you or otherwise discriminate against you in any way to prevent you from obtaining a welfare benefit or exercising your rights under ERISA. If your claim for a welfare benefit is denied in whole or in part, you must receive a written explanation of the reason for the denial. You have the right to have the plan review and reconsider your claim. Under ERISA, there are steps you can take to enforce the above rights. For instance, if you request materials from the Plan and do not receive them within 30 days, you may file suit in a federal court. In such a case, the court may require the Plan administrator to provide the materials and pay you up to $100 a day until you receive the materials, unless the materials were not sent because of reasons beyond the control of the administrator. If you have a claim for benefits which is denied or ignored, in whole or in part, you may file suit in a state or federal court. If it should happen that plan fiduciaries misuse the plan's money, or if you are discriminated against for asserting your rights, you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court. The court will decide who should pay court costs and legal fees. If you are successful, the court may order the person you have sued to pay these costs and fees. If you lose, the court may order you to pay these costs and fees, for example, if it finds your claim is frivolous. If you have any questions about your Plan, you should contact the Plan administrator. If you have any questions about this statement or about your rights under ERISA, you should contact the nearest Area Office of the U.S. Labor-Management Services Administration, Department of Labor.

*     *     *     *     *

Notes:  (1)  The Department of Labor has issued a number of administrative exemptions from certain reporting and disclosure requirements. Some of these exemptions may apply from time to time to the Plan described in this "Summary Plan Description." For example, many plans are exempted from preparing or filing annual reports and summary annual report. To the extent that such exemptions pertain to the Plan described in this "Summary Plan Description," the above "Statement of ERISA Rights" must be considered to be modified.

(2)   Among the bases for determining non-entitlement to benefits as claimed may be one or more of the following:  material misrepresentation in application for employment, participation or coverage; suicide; self-inflicted illness or injury; acts of war or civil unrest; injury suffered in the commission of a crime; elective surgical or medical procedures; alcohol or drug addiction contributing to the circumstance for which benefits are claimed, etc.  The foregoing list is not necessarily entirely applicable, and there may be other bases for denial not included on the list.

# EXHIBIT D

1
SUPERIOR COURT OF NEW JERSEY
LAW DIVISION-CAMDEN COUNTY
2
L-2862-00

3
_____

4  JAMES FOX, RICHARD DiFABIO,
   RONALD FORBES, ROBERT STILES,
5  DANIEL GEARY, ANTHONY SCARDAPANE
   AND THOMAS PARRY,
6
                        DEPOSITION OF:
                   ANTHONY SCARDAPANE
7       Plaintiffs,

8  v.
                        ORIGINAL
9  THE LANGSTON CORPORATION,
   BANK BOSTON AND FLEET BOSTON
10 FINANCIAL CORP., j/s/a,

11      Defendants.

12 _____

13 TRANSCRIPT of the stenographic notes of the

14 proceedings in the above-entitled matter, as taken

15 by and before MARGARET M. REIHL, CCR, RPR, CRR,

16 CLR and Notary Public, held at the offices of

17 JOSEPH A. CARMEN, ESQUIRE, 9004-H Lincoln Drive

18 West, Marlton, New Jersey, on Tuesday,

19 October 6, 2009, commencing at 2:26 p.m.

20

21

22

23

24

25      Job No.: 219102

71

1  it wasn't produced to us in this case, and I'm just

2  wondering if you have a copy of it?

3  A.      I have a copy.

4  Q.      Oh, you do.

5  A.      Yeah.

6  Q.      And where is that document?

7  A.      I got it.  Not at this table, but I got it.

8  Q.      But you have it at home?

9  A.      Yeah.

10                 MR. NOVICH:  Okay.  Just make a request

11  for a copy of that.

12  BY MR. NOVICH:

13  Q.      And did you receive any other documents in

14  connection with your severance?

15  A.      The letter that we weren't going to get any

16  more.

17  Q.      Let me show you what's been marked as Exhibit

18  D-3, and I'm going to represent to you, sir, when we

19  took Mr. Forbes' deposition earlier in the day, he

20  produced that document for the first time today and

21  said -- testified that this was the basis for his

22  severance claim?

23  A.      This document?

24  Q.      Exactly.  And my question to you is are you

25  claiming that you're owed unpaid severance based on

72

1  this document as well?

2                    MR. CARMEN:  Well, just for the record,

3  I want to place an objection.  I think that you

4  characterized Forbes' statement really as a

5  conclusion.  He testified that the document was a

6  basis; however, it might have been updated several

7  times.  It was from 1974.  That's on the record.

8                    MR. NOVICH:  I think he testified he

9  didn't know if there were any updates or not.  I'm

10 pretty sure I went back and asked him do you know one

11 way or another if there were updates, and he said I

12 don't know.

13                   MR. CARMEN:  As long as it's on the

14 record.

15 BY MR. NOVICH:

16 Q.       Let me ask you this:  Did you receive this

17 similar type of document?

18 A.       No.

19 Q.       So you never received this document?

20 A.       Not that I know of.  I might -- I don't

21 recognize it.  That's what I know.

22 Q.       Is it your testimony that you may have, it's

23 possible you received this document in connection with

24 your severance plan?

25 A.       I have to say I personally don't remember

73

1  seeing this document.

2  Q.      Okay.  Let me ask you this: Mr. -- I'm going

3  to represent to you that Mr. Forbes testified that he

4  received this document in connection with Langston's

5  severance plan, severance benefits, okay?

6  A.      Yeah.

7  Q.      Do you have any reason to doubt that

8  testimony?

9  A.      I have no reason to doubt it because he might

10  have been given it by his manager.

11  Q.      Okay.  If I were to tell you that that same

12  document was the one that was given to all eligible

13  Langston employees who could participate in the

14  severance plan, would you have any reason to doubt

15  that statement?

16  A.      No, you know, I don't know.

17             MR. CARMEN:  Let me object to the form

18  of that question because how would he know what other

19  employees got.

20             MR. NOVICH:  He might know.

21             MR. CARMEN:  That's conclusionary.

22             THE WITNESS:  I've never seen this

23  document that I know of.

24  BY MR. NOVICH:

25  Q.      Do you have any reason to doubt -- I know you

1  aware of.  It might have been written later than the

2  one I've had.  I'm 38 years, you know.

3  Q.      Again, you know, I told you at the beginning

4  of the deposition, I expect there's going to be a lot

5  of questions that you don't know the answer to.  It's

6  perfectly fine.

7  A.      Yeah.  If you shut it off a minute, I could

8  tell you there was many plans, pension plans, this

9  plan, that plan changed over the years.

10 Q.      Okay.

11 A.      You know so...

12 Q.      But based on your experience working at

13 Langston, they did have a plan that governed your

14 severance, correct?

15 A.      Yes.

16 Q.      Show you this, let me show you what's been

17 marked as Exhibit D-4.  That's the letter that was

18 sent to Mr. Forbes, okay, and you talked about that

19 you -- and he testified that he received that letter

20 approximately a month after his termination, notifying

21 him that his severance was being terminated, and

22 you've testified about receiving such a letter.

23 A.      Correct.

24 Q.      Was it just like that except addressed to you?

25 A.      Exactly, except with my name on it.

```
 1                        SUPERIOR COURT OF NEW JERSEY
                          LAW DIVISION-CAMDEN COUNTY
 2                        L-2862-00

 3    _____

 4    JAMES FOX, RICHARD DiFABIO,               Certified
      RONALD FORBES, ROBERT STILES,
 5    DANIEL GEARY, ANTHONY SCARDAPANE          Transcript
      AND THOMAS PARRY,
 6                                              DEPOSITION OF:
                                                THOMAS PARRY
 7              Plaintiffs,

 8    v.

 9    THE LANGSTON CORPORATION,
      BANK BOSTON AND FLEET BOSTON
10    FINANCIAL CORP., j/s/a,

11              Defendants.

12    _____

13    TRANSCRIPT of the stenographic notes of the

14    proceedings in the above-entitled matter, as taken

15    by and  before MARGARET M. REIHL, CCR, RPR, CRR,

16    CLR and Notary Public, held at the offices of JOSEPH

17    A. CARMEN, ESQUIRE, 9004-H Lincoln Drive West,

18    Marlton, New Jersey, on Wednesday,

19    October 7, 2009, commencing at 10:04 a.m.

20

21

22

23

24

25       Job No.: 219103
```

74

1   Q.      Now, the document refers to the severance pay
2   plan, and I believe your earlier testimony was that
3   there was a severance pay plan; do you recall that?
4   A.      Yes.
5   Q.      Do you have any copy of that plan?
6   A.      No, I don't.
7   Q.      Were you provided with it at one time?
8   A.      I think at one time we were all given that as
9   part of our employee handbook.
10  Q.      Okay.  And let me show you a document marked
11  Exhibit D-3, and I'm going to represent to you that
12  Mr. Forbes produced that on the day of his deposition
13  yesterday for the first time.  He had a copy of that.
14  Take a look at it.
15          My question to you does that look like what it
16  purports to be, which is the Langston Severance Pay
17  Plan Summary Plan Description?
18  A.      It is a summary of a severance plan.
19  Q.      Okay.  Do you recognize that document; does it
20  appear familiar to you?
21  A.      What I do recognize is this table.
22  Q.      On Page 3?
23  A.      Page 3.  The rest of the document is a little
24  fuzzy, but I do remember this table, so that's what I
25  base my severance package on.

75

1   Q.       Okay.  Do you have -- sitting here right now,

2   do you have any reason to doubt that this document is

3   the Langston Severance Pay Plan Summary Plan

4   Description?

5   A.       No reason to doubt that.

6   Q.       Do you know if this document was ever revised

7   or updated?

8   A.       No.

9   Q.       Do you know whether this -- strike that.

10          Was it your understanding that your severance

11  was governed by the plan?

12  A.       My understanding, yeah, yes, that there was a

13  company policy regarding severance.

14  Q.       And that the plan set forth the current

15  conditions and terms of your severance?

16  A.       Yes.

17  Q.       Do you know if the Langston severance pay plan

18  provided Langston with the right to terminate your

19  severance?

20  A.       I don't know that.

21  Q.       Do you know if Langston had that ability?

22  A.       They did.

23  Q.       They did?

24  A.       Terminated my severance, yeah.

25  Q.       But do you know if Langston had the right to

76

1  terminate your severance pursuant to the plan?

2  A.      No.

3  Q.      I'm going to show you Page 4 of the plan

4  description, and it says, you can read it for

5  yourself, but I'm going to read it to you, "the events

6  indicated below shall result in disqualification,

7  ineligibility or denial, loss, forfeiture or

8  suspension of any benefits that you or your

9  beneficiary might otherwise anticipate or receive,"

10  and then someone drew an arrow.  I asked Mr. Forbes if

11  he drew that arrow.  He says he may have.  And it

12  says, "termination or modification of the Plan (a

13  right reserved to the Plan Sponsor)."

14       Was it your understanding that Langston was

15  the plan sponsor?

16  A.      Yes.

17  Q.      What's your understanding of that language?

18  Do you understand that to mean that Langston reserved

19  the right to terminate the plan?

20  A.      Yes, yeah.

21  Q.      And then if you turn to Page 7, and, again,

22  you can look at this for yourself if you want, but it

23  says, "the plan may be amended, modified or terminated

24  at any time by the Plan Sponsor without previous

25  notice to any person or entity.  The Plan shall be

1        SUPERIOR COURT OF NEW JERSEY
         LAW DIVISION-CAMDEN COUNTY
2        L-2862-00

3    _____

4    JAMES FOX, RICHARD DiFABIO,          ORIGINAL
     RONALD FORBES, ROBERT STILES,
5    DANIEL GEARY, ANTHONY SCARDAPANE
     AND THOMAS PARRY,

6                                         DEPOSITION OF:
                                          RICHARD DiFABIO
7            Plaintiffs,                   VOLUME II

8    v.

9    THE LANGSTON CORPORATION,
     BANK BOSTON AND FLEET BOSTON
10   FINANCIAL CORP., j/s/a,

11           Defendants.

12   _____

13

14           TRANSCRIPT of the stenographic notes of the

15   proceedings in the above-entitled matter, as taken by and

16   before MARGARET M. REIHL, CCR, RPR, CRR, CLR and Notary

17   Public, held at the offices of JOSEPH A. CARMEN, ESQUIRE,

18   9004-H Lincoln Drive West, Marlton, New Jersey, on Wednesday,

19   October 8, 2009, commencing at 10:02 a.m.

20

21

22

23

24

25   Job No. 219104

166

1 Q.  "In accordance with the company's severance

2 pay plan, you are entitled to 44 weeks of severance

3 pay."

4 A.  That's correct.

5 Q.  Okay.  Is that the basis for your claim, as

6 far as you know --

7 A.  As far as I know, yes.

8 Q.  -- that you are owed 44 weeks of severance?

9 A.  That's correct.

10 Q.  Okay.  Is your claim based on anything else,

11 other than this Exhibit D-13?

12 A.  No.

13 Q.  Now, it says, in accordance with the company's

14 severance pay plan.  Were you ever provided with or

15 did you ever receive at any time Langston's severance

16 pay plan?

17 A.  Whatever I have I gave to Joe.

18 Q.  I understand that.  But do you know if during

19 your employment with Langston you ever were provided

20 with or you ever received a document regarding the

21 company's severance pay plan?

22 A.  Did I ever, no.  The answer is no.  Nobody

23 ever sent me something to say this is the severance

24 pay while I was employed there, no.  In 23 years I

25 never got that.

Veritext/NJ Reporting Company

800-227-8440                973-410-4040

167

1   Q.      You are saying you never got the pay plan?

2                   MR. CARMEN:  That appears that's what

3   he's saying.

4                   MR. NOVICH:  I know, but I just want to

5   make it clear.

6   BY MR. NOVICH:

7   Q.      Are you saying that you never got it, you

8   never got the pay plan, or you don't recall whether

9   you ever received the pay plan?

10  A.      No, I never received anything that said this

11  is the pay plan.

12  Q.      Do you know if you ever had access to the

13  company's pay plan?

14  A.      Other than what it says here, that the

15  severance plan is based on length of service and

16  position, you know, I --

17  Q.      Did anyone ever tell you that Langston had a

18  severance pay plan, other than --

19  A.      Absolutely.  Everybody knew we had a severance

20  pay plan.

21  Q.      Okay.  Did you ever ask to see the severance

22  pay plan?

23  A.      I would have had no reason to ask.

24  Q.      Okay.  So the answer to my question is --

25  A.      I trusted that personnel would do their work

168

1    and the company would do their work.  I had things to

2    do.

3    Q.      So the answer to my question is you never

4    asked to see the company's severance pay plan; is that

5    correct?  Just answer the question, sir.

6    A.      I knew it existed.  Did I ever go to personnel

7    and say, hey, I want a copy of the severance pay plan?

8    Absolutely not.

9    Q.      Okay.  Now, let me show you what Mr. Forbes

10   produced on the day of his deposition.  It was a

11   document marked Exhibit D-3.  Mr. Forbes came to his

12   deposition with some documents, and this was one of

13   them that he had from Langston, all right.  And the

14   document is entitled The Langston Severance Pay Plan

15   Summary Plan Description.

16   A.      You want me to read all this?

17   Q.      Well, if you need to, but I just had a simple

18   question for you, had you ever seen this document

19   before that you know of?

20   A.      Without going all through this, I never -- you

21   know, was it part of Langston's plan --

22   Q.      No, no.  My question to you is have you ever

23   seen this document before?

24   A.      I don't recall ever seeing this or reading

25   this document, the answer is no.

169

Q.      Do you have any reason to --

                MR. CARMEN:  Well, now, wait a minute.

I object to --

                MR. NOVICH:  I didn't even ask the

question, and you are objecting to it.

                MR. CARMEN:  I know because if a

witness doesn't identify a document, okay, the Rules

of Evidence are such then you're going to ask him does

he have any reason?  He doesn't know what the document

is, he can't answer that question, and I will instruct

him not to answer it because he doesn't identify the

document.

                If a witness says I don't know what

this document is, now you're going to ask any reason,

well, I don't know.  The answer is I don't know.  I

didn't see this document.  So you're going to ask him

is this line true.  I understand what you're trying to

do, but he did not -- under the Rules of Evidence if

he doesn't identify a document, he can't be asked

questions on it.

                MR. NOVICH:  All right.  Well, this is

what -- I mean, we can engage in this whole colloquy

now, but this is discovery.  We're not at trial.  So

the Rules of Evidence don't strictly apply to this

proceeding.

170

1          MR. CARMEN:  I understand that.  I

2    understand that they don't --

3          MR. NOVICH:  Let me finish.  I let you

4    finish, Joe.

5          So that's number one.  Number two, I'm

6    just asking him a question.  The judge can rule on it

7    later whether that question should be stricken or not,

8    read to the jury, so forth.

9          MR. CARMEN:  Or included in the motion.

10         MR. NOVICH:  Or included in the motion,

11   that's fine.  You placed your objection on the record.

12         MR. CARMEN:  Okay, all right.

13         MR. NOVICH:  All right.

14   BY MR. NOVICH:

15   Q.    So my question to you is with all those

16   caveats in mind, looking at Exhibit D-3, do you have

17   any reason to believe, as you sit here today, that

18   this document isn't what it purports to be, which is

19   the Langston Severance Pay Plan Summary Plan

20   Description?

21   A.    If this came from Langston and was an official

22   document at Langston, hey, then that's what it says.

23   I mean, did I ever see this document?

24   Q.    I'm just asking you --

25   A.    I don't recall ever seeing this document.

171

1    Q.      You made that clear.  You made that clear.

2    I'm just asking you -- now I'm asking you for

3    information beyond what this document -- whether

4    you've seen it or not.  I'm asking you, based on all

5    the years you worked at Langston, all your experience,

6    do you have any reason to believe that this

7    document --

8    A.      Is false?

9    Q.      Hold on.  Let me finish.  You keep jumping the

10   gun, all right.

11           Do you have any reason to believe that this

12   document is not what it purports to be, and what it

13   purports to be, based on the title, is the Langston

14   Severance Pay Plan Summary Plan Description?  It's a

15   yes or no.  Do you have any reason to believe that

16   this document is not what it purports to be?

17   A.      The answer is no.  I haven't read the damn

18   thing, but if it says the Langston Severance Pay Plan

19   Summary Plan Description, it must be, and it came from

20   Langston, then I believe -- I have no reason to

21   believe it's false.

22   Q.      Well, it came from Mr. Forbes.

23   A.      Well --

24   Q.      Hold on, let me finish.

25           It came from Mr. Forbes who said it came from

1                          SUPERIOR COURT OF NEW JERSEY
                           LAW DIVISION—CAMDEN COUNTY

2                           L-2862-00

3     ————————————————————

4     JAMES FOX, RICHARD DiFABIO,
      RONALD FORBES, ROBERT STILES,

5     DANIEL GEARY, ANTHONY SCARDAPANE
      AND THOMAS PARRY,

6                                   DEPOSITION OF:
                                  JAMES J. FOX

7         Plaintiffs,

8     v.

9     THE LANGSTON CORPORATION,
      BANK BOSTON AND FLEET BOSTON

10    FINANCIAL CORP., j/s/a,

11        Defendants.

12    ————————————————————

13

14             TRANSCRIPT of the stenographic notes of the

15   proceedings in the above-entitled matter, as taken by and

16   before MARGARET M. REIHL, CCR, RPR, CRR, CLR and Notary

17   Public, held at the offices of JOSEPH A. CARMEN, ESQUIRE,

18   9004-H Lincoln Drive West, Marlton, New Jersey, on Wednesday,

19   October 8, 2009, commencing at 1:04 p.m.

20

21

22

23

24

25   Job No. 219104

136

1    Q.      Is your claim for unpaid severance, as far as

2    you know, based on anything else but Exhibit D-2, that

3    information?

4    A.      No reason to.

5    Q.      What's that?

6    A.      No reason to.

7    Q.      Okay.  Just so the record is clear, I think

8    we're in agreement, you don't have any other basis for

9    your claim of unpaid severance but Exhibit D-2,

10   correct?

11   A.      That's correct.

12   Q.      And the document that you just read that you

13   said you also received says, in accordance with the

14   company's severance pay plan?

15   A.      Yes.

16   Q.      Did you ever receive or were you ever provided

17   access to the company's severance pay plan?

18   A.      Yes.  I was going to qualify that answer,

19   because, yes, the employees handbook that every

20   employee is given has the pay plan in it, and there

21   would be the schedule of years, and that also would

22   show my 52 weeks.

23   Q.      And you recall you received that --

24   A.      Yes.

25   Q.      -- with your handbook?

137

1   A.      Yes.

2   Q.      Okay.  I'm going to represent to you -- well,

3   do you still have a copy of that?

4   A.      Probably at home someplace.

5   Q.      Okay.  I'm going to represent to you that the

6   severance pay plan in your handbook or severance pay

7   plan that you received was not produced to us in

8   connection with this case, so I just ask that if you

9   have a copy of that, that you provide it to Mr. Carmen

10  who can send it to me, okay?

11  A.      Okay.

12  Q.      All right.  But what we are fortunate to have,

13  Mr. Forbes on Tuesday brought with him a number of

14  documents that we saw for the first time in this case

15  that were not previously produced to us earlier than

16  Tuesday, and one of those documents that Mr. Forbes

17  produced was Exhibit D-3.  Take a look at that

18  document and tell me if you recognize that?

19  A.      Looks familiar.

20  Q.      Okay.  Is that the document that you were

21  referring to in your employee handbook?

22  A.      I can't say yes or no.  I don't know if I have

23  a revised version or if this is a revised version of

24  what I have.

25  Q.      Okay.  Or if that's the actual version?

138

1    A.       Or if it's the same version.

2    Q.       Do you know if the Langston severance pay plan

3    was ever revised; do you know one way or the other?

4    A.       I don't know one way or the other.

5    Q.       Do you know if it was ever updated one way or

6    the other?

7    A.       I don't know.

8    Q.       But what you do recall is that there was

9    definitely a plan, written document that was part of

10   your employee handbook?

11   A.       Absolutely.

12   Q.       And you believe you may have a copy of that?

13   A.       I believe I may have a copy.

14   Q.       Okay.  Would you have retained any updates or

15   revisions that were provided to you?

16   A.       Probably not.  The rule of thumb was here's

17   the new piece of paper, throw away the old one.

18   Q.       So, but based on that, you would have the most

19   recent document that was provided to you?

20   A.       I would hope so.

21   Q.       The most recent plan?

22   A.       I would hope so.

23   Q.       Well, do you have any knowledge of anything

24   that occurred to you while you worked at Langston that

25   would suggest to you in any way that there was a more

139

```
1   recent plan that you don't have for some reason?  Was
2   there an experience that happened at Langston --
3   A.      Only that the communications --
4   Q.      Let me just finish.  That said, hey, Jim we
5   all got a copy of the plan, did you get one?  And you
6   said, oh, no, I didn't get that, and for some reason
7   you never got around to getting that; did anything
8   like that happen?
9   A.      No, there was nothing like that.
10  Q.      Okay.
11  A.      The only thing that I could say was that the
12  lines of communication with Andy Reisman were anything
13  but perfect.
14  Q.      Towards the end?
15  A.      Well, during the whole time that I was there.
16  So if --
17  Q.      Well, Mr. Reisman became your supervisor in
18  November of 1998?
19  A.      Under him, during that period, if that new
20  group of management changed the plan, I don't know
21  that, and Reisman did not give me a copy.
22  Q.      But, as you sit here today, you don't have any
23  evidence to suggest that there was any revision or
24  update to the plan at all, correct?
25  A.      I do not.
```